IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


GUERRY WAYNE HERTZ,

      Petitioner,

v.                              CASE NO.: 4:06cv507-RS

WALTER A. McNEIL,[1]
      Secretary, Fla. Dept. of Corrections, et al.,

      Respondents.

_____/


ORDER

    Before me is the Petition for Writ of Habeas Corpus filed by Guerry Wayne

Hertz, a Florida death row inmate, pursuant to Title 28, United States Code, Section

2254 (Doc. 1).  Hertz has asserted four claims for relief.

I.  FACTS & PROCEDURAL HISTORY

    The relevant facts are set out as follows in the Florida Supreme Court's opinion

affirming Petitioner's conviction and sentence:

> In the early morning hours of July 27, 1997, the charred bodies of
> Melanie King and Robin Keith Spears were found in the victims'
> burning home in Wakulla County, Florida.  Hertz, Jason Looney, and
> Jimmy Dempsey were each indicted for the first-degree murders of the

---

[1]Walter A. McNeil succeeded James R. McDonough as Secretary for the Department of
Corrections and is automatically substituted as Respondent.  See Fed. R. Civ. P. 25(d)(1).

victims, and each codefendant was also charged with burglary of a dwelling while armed, armed robbery with a firearm, arson of a dwelling, and use of a firearm during the commission of a felony as a result of this incident. Prior to trial, codefendant Dempsey negotiated a plea with the State and was sentenced to consecutive life sentences in return for providing his testimony at Hertz and Looney's joint trial.

The evidence presented at the trial revealed the following facts. At approximately 11 p.m. on July 26, 1997, Hertz and his codefendants left an acquaintance's house on foot within walking distance from the victims' home. All three men were armed with guns. A resident who lived about 500 yards from the victims testified that Hertz appeared at her door at about 2 a.m. asking to use her phone because "his truck had broken down." When she refused, the trio continued down the road towards the victims' home and, upon seeing the victims' black Mustang, Looney said, "There's my car right there. That's the one I want."

Dempsey and Hertz went to the victims' front door as a decoy and asked if they could use the phone. King provided them with a cordless phone, and Dempsey feigned making a phone call. When Dempsey attempted to return the phone, Hertz pointed his gun at King and forced his way in. Looney then entered and pointed his rifle at Spears. Spears and King were bound and gagged with duct tape and placed face down on their bed. Hertz and his codefendants removed a significant amount of the victims' property, including a VCR, a television, jewelry, furniture, and CDs, and loaded the victims' belongings into the victims' two vehicles. Looney also found approximately $1500 of the victims' money in an envelope, which was ultimately divided equally among the three.

Hertz and Looney concluded that they could leave no witnesses and informed Dempsey of their decision. Dempsey said Hertz and Looney poured accelerants throughout the victims' home. All three men, still armed, went to the bedroom where the victims were bound, side-by-side, face down on their bed. When they entered the back bedroom, King said that she would "rather die being burnt up than shot." She stated, "Please, God, don't shoot me in the head." Hertz replied, "Sorry, can't

do that," and then he proceeded to open fire; Looney followed and then Dempsey. The victims died as a result of the gunshot wounds.

Subsequent to the shooting, the victims' home was set ablaze. Hertz drove away in the victims' white Ford Ranger, and Looney drove the victims' black Ford Mustang, with Dempsey as a passenger. According to Dempsey, the whole episode at the victims' home lasted about two hours. The trio proceeded to Hertz's house and unloaded the stolen items and divided up the money. Two employees at the Wal-Mart in Tallahassee testified that the three men made purchases at the store at around 5 a.m. the morning of the murders, before "showing off" their new vehicles, i.e., a black Mustang and a white Ford Ranger, to both of the employees. A Wal-Mart receipt for a clothing purchase was later found in the victims' Mustang, corroborating the employees' testimony.

Hertz and his codefendants made their way to Daytona Beach Shores where, later that day, they were involved in a pursuit and shootout with police. Looney and Dempsey were arrested after abandoning and fleeing from the victims' black Mustang. Hertz abandoned the victims' Ford Ranger after being shot, and he paid a cabdriver $100 to drive him to his aunt's house in St. Augustine. Hertz was arrested that same day in St. Augustine, and victim Spears' .9mm gun was recovered from Hertz's bag.

A firearms expert with FDLE testified that one of the bullets recovered from the area of the victims' burned bed was fired from the .380 Lorcin handgun recovered from Looney at the time of his arrest in Daytona Beach, i.e., the same handgun owned by Keith Spears and used, according to Dempsey, by Hertz to shoot the victims. The other bullet was fired from a .30 caliber rifle used by Looney to shoot the victims, and later recovered in the victims' Mustang. A roll of duct tape, Looney's wallet with $464, and Dempsey's wallet with $380 were also found in the Mustang. A fingerprint analyst with FDLE analyzed latent fingerprints taken from the Mustang and concluded that Hertz and his codefendants had all touched the car. The chemist found evidence of various accelerants on items of clothing found in the Mustang. In

addition, a law enforcement investigator with the State Fire Marshal's Office testified that the kind of damage that was done by the fire does not happen unless an accelerant is used.

The state medical examiner testified that the bodies were severely burned. He graphically detailed the condition of the bodies as depicted in the photographs: the legs were burned off below the knees, the hands were burned to nubs, the bones of the arms were fractured by the fire, and the skulls were burned partially away. The victims had to be positively identified by dental records. The medical examiner also testified that there could have been other injuries that were not detected due to the extensive burns.

King was shot at least two times in the head, which caused her death. However, the medical examiner was not able to trace the path of the bullet because the skull was burned away. He testified that it was possible that other bullets struck the body, which could not be determined because of the fire. King lived one to two minutes after she was shot. However, there was no soot in the trachea, indicating that she was not alive when the fire started. Spears was shot at least one time in the head, which caused his death. The bullet went in the back of the neck and exited above the right eye. Spears also lived one to two minutes after he was shot, and again, no soot was discovered in his trachea, meaning that he was dead at the time of the fire. The defense did not present any evidence.

A jury convicted both Hertz and Looney of the first-degree murders of King and Spears, burglary of a dwelling while armed with a firearm, armed robbery with a firearm, arson of a dwelling, and use of a firearm in the commission of a felony. By a majority vote of ten to two, for each murder, the jury recommended and advised that the death penalty be imposed against Hertz and Looney. By written order, the judge imposed a sentence of death for each murder.

Hertz v. State, 803 So.2d 629, 635-637 (Fla. 2001)(per curiam) (Hertz I). The trial court found the following aggravating factors with respect to Petitioner: (1) the

capital felony was committed by a person convicted of a felony and who was on felony probation; (2) the capital felony was committed by a person previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while Petitioner was engaged in the commission of a burglary, arson, and robbery; (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (5) the murder was committed for financial or pecuniary gain (the court merged this aggravating factor with the fact that the capital felony was committed during the course of a burglary, arson, or robbery); (6) the murder was especially heinous, atrocious, or cruel, and (7) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification. Id. at 637.

The trial court found the following factors in mitigation, including two statutory aggravators: (1) Petitioner's impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law which was given some weight; (2) his age of 20, which was given only moderate weight; and (3) as to all other nonstatutory mitigation, (a) Petitioner's difficult childhood was given significant weight; (b) the fact that Petitioner had no significant criminal history or no history of violence and the fact that he posed no problems since being incarcerated were given marginal weight; (c) Petitioner's remorse and the fact that he cried during some of the testimony and when he made his statement to the court was given moderate weight; (d) the fact that society would be adequately protected if he were to be given a life sentence without the possibility of parole was entitled to "no weight" and (e) the fact that a codefendant, Dempsey, received a life sentence following a plea, was given significant weight and substantially considered by the

trial court. Id. at 637-38. Petitioner was sentenced to life on the charge of burglary of a dwelling while armed; life on the robbery with a firearm charge; 30 years on the arson charge; and 15 years for the use of a firearm during the commission of a felony, with all sentences to run consecutive to one another. Id. at 638.

On direct appeal Petitioner raised nine claims.[2] The Florida Supreme Court affirmed Hertz's convictions and sentences, denying all claims. See Hertz I. Certiorari was denied by the United States Supreme Court. See Hertz v. Florida, 536 U.S. 963, 122 S. Ct. 2673, 153 L. Ed. 2d 846 (2002). Thereafter, Petitioner filed a motion and amended motion for postconviction relief pursuant to rule 3.851, raising only two issues: an ineffective assistance of counsel claim relating to penalty phase mental health mitigation and a claim under Ring v. Arizona, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). The trial court denied postconviction relief, and this denial was affirmed on appeal. See Hertz v. State, 941 So.2d 1031 (Fla. 2006)(Hertz II).

## II. STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to

---

[2]Petitioner raised the following issues: (1) the trial court improperly excused for cause a venire member whose opposition to the death penalty did not prevent or substantially impair her ability to perform her obligations; (2) he was not competent to stand trial; (3) the trial court erred by admitting gruesome photographs of the bodies at the crime scene and the autopsy; (4) the details of the collateral crimes in Volusia County became a feature of the trial causing prejudice that substantially outweighed the probative value of the evidence; (5) the evidence was insufficient as a matter of law to sustain the convictions; (6) the statute authorizing the admission of victim impact evidence is an unconstitutional usurpation of the Court's rulemaking authority under article V, section 2, of the Florida Constitution, making the admission of such testimony unconstitutional and reversible error; (7) the trial court erred in denying the defense motion to require a unanimous verdict; (8) four of the seven aggravating factors upon which the jury was instructed and which the trial court found are legally inapplicable and their consideration was not harmless error; and (9) the death sentence in this case is disproportionate. Hertz v. State, 803 So.2d 629, 638 n.2 (Fla. 2001).

the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." This petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d)      An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3] The appropriate test in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal

---

[3]Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 165-66, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding. See Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002). First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication. Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law. Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344. "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme

Court precedent." <u>Wellington</u>, 314 F.3d at 1260 (<u>quoting</u> <u>Fugate v. Head</u>, 261 F.3d 1206, 1216 (11th Cir. 2001), <u>cert. denied</u>, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (<u>quoting</u> <u>Williams</u>, 529 U.S. at 405)). "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." <u>Wellington</u>, 314 F.3d at 1260 (<u>quoting</u> <u>Williams</u>, 529 U.S. at 404–06). If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority." <u>Fugate</u>, 261 F.3d at 1216. Likewise, if the facts of the Supreme Court cases and the petitioner's case are <u>not</u> substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law." <u>Id</u>. (citing and quoting <u>Williams</u>, 529 U.S. at 406). A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."

<u>Williams</u>, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Bell v. Cone</u>, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting <u>Williams</u>, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error." <u>Williams</u>, 529 U.S. at 389.   "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent.   <u>Van Poyck v. Fla. Dep't of Corrections</u>, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

    In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); <u>see</u> <u>Miller-El v. Cockrell,</u> 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L.

Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); see also Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations).  Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence.  See Callahan v. Campbell, 427 F.3d 897, 926 (11th Cir. 2005) (citing § 2254(e)(1); Rutherford v. Crosby, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")).

Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in Brecht v. Abrahamson, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993).  The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" Id. at 637 (quoting Kotteakos v. United States, 328 U.S.

750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[4]

Within this framework, the Court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

A.    Claim One:

### The Trial Court Improperly Excused for Cause a Prospective Juror Whose Opposition to the Death Penalty Did Not Prevent or Substantially Impair Her Ability to Perform Jury Obligations

Petitioner contends that a particular prospective juror  was impermissibly struck from the venire based on the erroneous grounds that her opposition to the death penalty rose to the level of exclusion under Witherspoon v. Illinois, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968).  Petitioner alleges that this particular juror expressed only "a general opposition" to the death penalty, and that this opinion is not a valid basis for a challenge for cause.  (Doc. 1 at 26).

1.    State Proceedings

Petitioner raised this issue in the direct appeal of his conviction and sentence, and the Florida Supreme Court denied relief on the claim, holding as follows:

> [i]n the instant case, [this prospective juror] unequivocally stated during three separate responses that she could not impose the death penalty. [footnote omitted] Moreover, counsel for the defendants attempted to rehabilitate [this prospective juror] under the misconceived notion that because a juror may be willing to convict a defendant of first-degree murder, there is no need for that juror to have an open mind with regard to both the aggravation and mitigation to be presented in the penalty phase of a case.  The record is clear, however, that [this prospective juror] was not willing to consider all of the penalties provided by state law, i.e., the death penalty, and, therefore, the State's challenge for cause

---

[4]This harmless error standard is also applicable to cases involving habeas challenges to death sentences. See Calderon v. Coleman, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); Duest v. Singletary, 997 F.2d 1336 (11th Cir. 1993); Hicks v. Head, 333 F.3d 1280 (11th Cir. 2003).

was properly upheld. [citations omitted] For the foregoing reasons, we find no manifest error by the trial court in excusing [this prospective juror] for cause and, therefore, deny Hertz's claim.

Hertz I, 803 So.2d at 638-39.

2.      Clearly Established Supreme Court Law

The Sixth Amendment of the United States Constitution guarantees a defendant the right to a trial by impartial jurors. In Witherspoon v. Illinois, 391 U.S. at 522, the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." The Court later clarified this standard in Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), and held that the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Id. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526, 65 L. Ed. 2d 581 (1980)).

The Court in Witt addressed this issue in the context of federal habeas review and held that the findings of the trial judge are presumed correct unless one of the enumerated reasons for avoiding the presumption are present. See § 2254(d). The trial judge's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." Witt, 469 U.S. at 429. Therefore, because assessments of demeanor and credibility are "peculiarly within a trial judge's province," his or her determination on this issue is a factual finding which deserves deference on habeas review. Id. at 428.

In a recent case, <u>Uttecht v. Brown</u>, 127 S. Ct. 2218, 2224,167 L. Ed. 2d 1014 (2007), the Court reviewed <u>Witherspoon</u>, <u>Witt</u> and other relevant decisions and elaborated as follows:

> [t]hese precedents establish at least four principles of relevance here. First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law provides. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.
>
> Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.

(internal citations omitted).

3.    <u>Federal Review of Claim</u>

Turning to the facts of this case, the record is clear that this particular prospective juror clearly and unequivocally expressed that she could not vote to impose the death penalty in any case. During voir dire the following exchange occurred:

> MR. MEGGS [Attorney for the State]: Okay. So in an appropriate case, you could vote to impose the death penalty?
>
> JUROR: Well, I don't know if I could, really. My feeling is, even if

someone did kill someone, it wouldn't bring that other person back just by killing them.

MR. MEGGS: Well, here's kind of the posture we're in here now. You know, this is kind of informal, but the State is seeking the death penalty in this case. And at the conclusion of all the evidence, when you go back to deliberate, you're going to return a verdict of guilty or not guilty or some verdict dealing with this murder case.

If you do a verdict of guilty of first degree murder, then the death penalty is a possibility. Could you vote to impose–to convict somebody when the death penalty is a possibility?

JUROR: No, sir.

MR. MEGGS: You could not?

JUROR: No.

MR. MEGGS: Your Honor, I think at this point she's–

THE COURT: Do you have any other questions? All right, Mr. Cummings?

MR. CUMMINGS [Attorney for Co-defendant Jason Looney]: Ms. Free, you're saying you can't even vote in the guilt phase whether the person is guilty or innocent because you know that there's a possibility of the death penalty, is that correct?

JUROR: Yeah.

MR. CUMMINGS: Okay. Could you vote in the guilt or innocence phase if you knew that the possibility was life in prison without parole?

JUROR: Yes, I could do that.

MR. CUMMINGS: You could do that?

JUROR: Uh-huh.

MR. CUMMINGS: So in the situation that we're in today, there's two choices. Are you aware that whatever your choice is, it goes as a group recommendation to the Judge?

JUROR: Uh-huh.

MR. CUMMINGS: Six to six or, whichever way it looks like, it's just a recommendation.

JUROR: Yeah. Uh-huh.

MR. CUMMINGS: Could you sit in a panel and discuss with your fellow jurors your feelings why the death penalty wasn't appropriate in that case?

JUROR: Yes.

MR. CUMMINGS: You could certainly try to impose your opinion on others.

JUROR: I would try.

MR. CUMMINGS: And you'd listen to them, wouldn't you?

JUROR: Yes.

MR. CUMMINGS: So assuming you have all this discussion, an open discussion about the possibility of one sentence or the other, are you going to tell us today that you still couldn't participate in that discussion if you were on a jury?

JUROR: I just don't believe that I could actually be–take a person's life.

Even if they were found guilty of killing someone, I would just rather them spend the rest of their life in jail because it's not going to bring the person back, anyway.

MR. CUMMINGS: And that's true.

JUROR: Yeah, so–

MR. CUMMINGS: So you would have your opportunity, then, to express your opinions as to why this person should spend the rest of his natural life in prison, never getting out.

JUROR: Yeah.

MR. CUMMINGS: You'd have the ability to try to convince others–

JUROR: I would try, yeah.

MR. CUMMINGS: And you would try. But you don't necessarily want to be in that position, do you?

JUROR: Well, I mean, if I am, it wouldn't matter. My opinion is I just would not want to take someone else's life, just because–I mean, I know it's bad that they killed someone or anybody kills anybody, but it wouldn't bring that person back.

OR Vol. V at 171-74.[5] In addressing the State's motion to remove this particular prospective juror and another prospective juror for cause, the trial court stated, "[w]ell, both of these jurors indicated and said that under no circumstances would they vote in favor of the death penalty. I don't think there was any equivocation." Id. at 179.

---

[5]"OR" will connote the state court original trial record and "PCR" will connote the state court postconviction record.

Case No.: 4:06cv507-RS

The preceding exchange makes clear that this particular prospective juror stated unequivocally several times that she could not vote to impose the death penalty. Because her views would have prevented or substantially impaired the performance of her duties as a juror, her removal for cause was proper under the Sixth Amendment and prevailing Supreme Court law. The Florida Supreme Court properly identified and applied Witherspoon v. Illinois and Wainwright v. Witt to this claim. Petitioner has not demonstrated that the state courts' factual findings were incorrect or that its legal determinations were unreasonable or contrary to federal law.

When a state court has made a factual determination regarding an issue after a hearing on the merits, the trial court's findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). Petitioner has not presented sufficient evidence in his habeas petition to rebut the presumption of correctness applicable to state court determinations. The state courts' factual findings are supported by the evidence and must be given deference. Petitioner has failed to show that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Therefore, no habeas relief is warranted on this ground.

B.     Claim Two:   Petitioner was incompetent at the time of his state court trial

Petitioner contends that he was mentally incompetent when he was tried and convicted of these crimes and he was unable to assist his counsel and to understand the nature of the proceedings. He alleges that the state court's decision denying this claim does not comport with Supreme Court precedent on this issue.

1. <u>State Proceedings</u>

Petitioner raised this claim in the direct appeal of his conviction and sentence.

The Florida Supreme Court denied relief on this claim and found as follows:

> [t]he record reflects that a competency hearing was held April 7, 1999. At the conclusion of said hearing, the trial court, after reviewing all three doctors' reports, reviewing the rules, and observing Hertz, concluded that Hertz had sufficient present ability to consult with his attorney if he chose to do so and had a factual understanding of what was occurring at trial. Accordingly, the trial court found Hertz competent to stand trial.
>
> Although two defense experts found Hertz incompetent, Dr. Thomas Conger, a licensed clinical psychologist with over 29 years of neuropsychology experience testified that, in his expert opinion, Hertz was competent to stand trial. Dr. Conger testified that his opinion was based upon interviews and evaluations conducted with Hertz during two separate meetings lasting a total of approximately seven hours. At this time, Dr. Conger administered a comprehensive neuropsychological test battery as well as some additional testing that goes along with the comprehensive battery. Although Dr. Conger did find some evidence of learning disabilities and verbal difficulties, the results from four tests (designed to determine whether Hertz might be malingering) led Dr. Conger to question whether Hertz was putting forth his maximum effort during the testing.
>
> Moreover, the fact that Hertz had performed within normal limits on most of the tests administered to him would suggest that he was able to sustain his attention effectively. It was Dr. Conger's conclusion that if Hertz wanted to assist his attorney, he certainly had the abilities and memory of events in order to do so. He observed that Hertz, based on the tests given, can and does sustain performance at a normal level whether on medication or not. Accordingly, Dr. Conger testified that it was his opinion that Hertz was competent to stand trial.
>
> Despite Hertz's alleged Attention Deficit Hyperactivity Disorder

(ADHD), defense expert Dr. D'Errico agreed that Hertz understood the charges (and potential penalties) against him, was aware of the roles and functions of the courtroom personnel, and had a full-scale IQ score of 91, and it was a possibility that Hertz's self-abusive behavior (i.e., banging his head against the wall) could be evidence of malingering. [footnote omitted] Dr. D'Errico also indicated that everything Hertz said was coherent and understandable. Along the same lines, defense expert Dr. Sesta also indicated that Hertz understood the charges (and associated penalties) against him, was aware of the roles and functions of courtroom personnel, and had a full-scale IQ score of 94 with no evidence of schizophrenia, bipolar disorder, or any other major mental illness. He indicated that Hertz was clearly able to understand the "waiver" discussion the two engaged in and, at times, exhibited "disingenuous qualities" during his interviews.

Finally, the trial court's ruling clearly indicates that the trial court considered and, based upon its own observations, reasonably rejected the defense experts' opinions that Hertz's alleged distractability and hyperactivity would impede Hertz's ability to assist his attorney during trial:

> [T]he Court began to pay more attention to the activities of the defendant and it does not appear to the Court that there is sufficient indication of any hyperactivity. The Court would specifically note that on one occasion when the witness Hathcock [fellow inmate] was presented the defendant's attention became immediately focused and attentive. [footnote omitted]

Although there were conflicting opinions from experts on the issue of competency, we find it was in the sound discretion of the trial court to resolve the dispute and that the trial court did not abuse its discretion in finding Hertz competent to stand trial. See Hardy [v. State], 716 So.2d [761] at 764 [Fla. 1998](holding trial court did not abuse discretion in finding defendant competent where there was conflicting expert testimony regarding the defendant's competency).

<u>Hertz I</u>, 803 So.2d at 639-641.

2.      <u>Clearly Established Supreme Court Law</u>

The Due Process Clause of the Fourteenth Amendment prohibits states from trying or convicting a defendant who is mentally incompetent.  <u>See</u> <u>Pate v. Robinson</u>, 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966).  The Supreme Court has set the standard to be used in determining mental competency as whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him."  <u>Dusky v. United States</u>, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)(per curiam); <u>Drope v. Missouri</u>, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975).  <u>See</u> <u>also</u> <u>Indiana v. Edwards</u>, 128 S. Ct. 2379, 2383, 171 L. Ed. 2d 345 (2008).

In <u>Drope</u>, the Court elaborated as follows:

[t]he import of our decision in <u>Pate v. Robinson</u> is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

<u>Drope</u>, 420 U.S. at 180.  However, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."  <u>Medina v. Singletary</u>, 59 F.3d 1095, 1107 (11th Cir. 1995)(citation

omitted). A <u>Pate</u> analysis must focus on "what the trial court did in light of what it then knew, whether objective facts known to the trial court were sufficient to raise a bona fide doubt as to the defendant's competency." <u>Fallada v. Dugger</u>, 819 F.2d 1564, 1568 (11th Cir. 1987).

A petitioner who makes a substantive competency claim, contending that he was tried and convicted while mentally incompetent, "is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." <u>James v. Singletary</u>, 957 F.2d 1562, 1571 (11th Cir. 1992). This standard is in contrast to a petitioner who makes a procedural competency claim alleging that the trial court failed to hold a competency hearing after his competency was put at issue. To prevail on a procedural competency claim, "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." <u>Id</u>. at 1572 n.15 (<u>citing Fallada</u>, 819 F.2d at 1568). A petitioner who presents "clear and convincing evidence" which creates a "real, substantial and legitimate doubt" as to his competence is entitled to an evidentiary hearing on his substantive competency claim. <u>Medina</u>, 59 F.3d at 1106 (<u>quoting James</u>, 957 F.2d at 1573). However, the standard of proof is high, and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." <u>Card v. Singletary</u>, 981 F.2d 481, 484 (11th Cir. 1992)(quotations omitted).

"A presumption of correctness attaches to a state court's finding of competence and a federal habeas court must determine that the finding is not 'fairly supported by the record' before it may overturn a state courts' decision." <u>Medina</u>, 59 F.3d at 1106 (<u>quoting Maggio v. Fulford</u>, 462 U.S. 111, 117, 103 S. Ct. 2261, 2264, 76 L. Ed. 2d 794 (1983)); <u>Card</u>, 981 F.2d at 484 n.5 (<u>citing Demosthenes v. Baal</u>, 495 U.S. 731,

110 S. Ct. 2223, 109 L. Ed. 2d 762 (1990)); see also 28 U.S.C. § 2254(d). A district court's determination that there is insufficient evidence to generate a "substantial and legitimate doubt" as to the petitioner's competence is reviewed for clear error. Card, 981 F.2d at 483-84.

3.    Federal Review of Claim

Petitioner raised the issue of his competency prior to trial, and the trial court after conducting a hearing, determined that he was, in fact, competent to stand trial. Because the state court made a finding on Petitioner's competence at the time of his trial, a presumption of correctness attaches to this finding and only if the finding of competence is not fairly supported by the record may the state court's decision now be overturned.

A review of the testimony presented during the competency hearing demonstrates that the state court's conclusion that Petitioner was competent to stand trial is fairly supported by the record.  Petitioner presented two experts who had examined him and rendered opinions that he was not competent to stand trial.  Dr. Michael D'Errico, a forensic psychologist, explained that there are six areas to consider in determining whether a defendant is competent: (1) his ability to understand the charges against him; (2) his ability to understand the range and nature of possible penalties if convicted; (3) his understanding of the adversarial nature of the legal process, including his ability to state the roles and functions of various participants in the proceedings; (4) his ability to disclose to his attorney facts pertinent to the proceedings, including the ability to engage with his attorney in a meaningful way regarding his legal situation;  (5) his ability to maintain appropriate court room behavior; and (6) his ability to testify relevantly on his behalf regarding

his recall of the alleged offense.  OR Vol III at 331-32.[6]

---

[6]See also Fla. Stat. § 916.12 (1999) as follows:

916.12. Mental competence to proceed:

(1) A defendant is incompetent to proceed within the meaning of this chapter if the defendant does not have sufficient present ability to consult with her or his lawyer with a reasonable degree of rational understanding or if the defendant has no rational, as well as factual, understanding of the proceedings against her or him.

(2) The experts shall first determine whether the person is mentally ill and, if so, consider the factors related to the issue of whether the defendant meets the criteria for competence to proceed; that is, whether the defendant has sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether the defendant has a rational, as well as factual, understanding of the pending proceedings.

(3) In considering the issue of competence to proceed, the examining experts shall first consider and specifically include in their report the defendant's capacity to:

(a) Appreciate the charges or allegations against the defendant;
(b) Appreciate the range and nature of possible penalties, if applicable, that may be imposed in the proceedings against the defendant;
(c) Understand the adversarial nature of the legal process;
(d) Disclose to counsel facts pertinent to the proceedings at issue;
(e) Manifest appropriate courtroom behavior; and
(f) Testify relevantly;
and include in their report any other factor deemed relevant by the experts.

(4) If the experts should find that the defendant is incompetent to proceed, the experts shall report on any recommended treatment for the defendant to attain competence to proceed. In considering the issues relating to treatment, the examining experts shall specifically report on:

(a) The mental illness causing the incompetence;
(b) The treatment or treatments appropriate for the mental illness of the defendant and an explanation of each of the possible treatment alternatives in order of choices;
(c) The availability of acceptable treatment and, if treatment is available in the community, the expert shall so state in the report; and
(d) The likelihood of the defendant's attaining competence under the treatment recommended, an assessment of the probable duration of the treatment required to restore competence, and the probability that the defendant will attain competence to proceed in the foreseeable future.

(5) A defendant who, because of psychotropic medication, is able to understand the nature of proceedings and assist in the defendant's own defense shall not automatically be deemed incompetent to proceed simply because the defendant's satisfactory mental functioning is dependent upon such medication. As used in this subsection, "psychotropic medication" means any drug or compound used to treat mental or emotional disorders affecting the mind, behavior, intellectual functions, perception, moods, or emotions and includes antipsychotic, antidepressant, antimanic, and antianxiety drugs.

Dr. D'Errico testified that Petitioner was hyperactive during his testing and that this was consistent with his medical history of Attention Deficit Hyperactivity Disorder ("ADHD").  Id. at 338-39.  With regard to the competency  factors, Dr. D'Errico found that Petitioner understood the charges against him (factor one) and the penalties involved (factor two), and he understood the functions of various courtroom personnel (factor three).  Id. at 339-40.  Dr. D'Errico testified, however, that Petitioner claimed that he was unable to give a narrative report of the events of the offense and seemed to have only a factual understanding of the situation.  Id. at 340.  Dr. D'Errico did not believe that Petitioner had a rational understanding of the situation "mainly because of the amount of State's evidence in this case.  And he seems to be totally–dealing unrealistically with his legal situation because of that."  Id. at 341.  Dr. D'Errico believed that because of this lack of rational understanding, Petitioner would be unable to assist his attorneys in a coherent fashion.  He also felt that Petitioner would have problems sitting quietly in court and paying attention during the trial and may have trouble testifying relevantly.  Id. at 349.

On cross-examination, when Dr. D'Errico was asked why Petitioner had been able to give  details of the offense to law enforcement and a fellow inmate after his arrest, yet could not give him these same details, Dr. D'Errico stated that he was not sure.  Id. at 353. Dr. D'Errico conceded that it was possible that Petitioner was malingering, but he felt that Petitioner was not feigning his hyperactivity.  Dr. D'Errico also conceded that Petitioner's  claim that he has an imaginary friend, George, may also be indicative of malingering.  Id. at 355.  Dr. D'Errico concluded that Petitioner was of average intelligence and diagnosed him as follows:

---

> I consider him to be suffering from some type of hyper–some type of disorder which includes hyperactivity and inability to concentrate, inability to attend to tasks, and whether or not he is malingering certain things such as a little friend, banging his head, and saying he can't remember the offense just because he wants to pull the wool over my eyes. All of that aside, the symptoms he's showed me, his hyperactivity and inattention, and distractibility can still makes me think he has an inability to assist his attorney for that reason, an inability to work with his attorney during court. And for that reason I believe, it's still my opinion given all that, that he be incompetent for trial.

Id. at 358. Dr. D'Errico recommended that Petitioner undergo a period of treatment, approximately three to four weeks in a hospital setting, and believed that with proper medication he would then be competent to stand trial. Id. at 347-48.

The defense also called Dr. Joseph Sesta, a neuropsychologist, who interviewed and tested Petitioner. Dr. Sesta immediately noticed characteristics of ADHD in his behavior and noted that one of the hallmarks of this type of neurological dysfunction is variability, so Petitioner can appear both functional and dysfunctional at various times. Id. at 369-70. Dr. Sesta found indications of mild cerebral dysfunction, or mild range brain impairment, which he determined represented a neurodeficit developmental disorder; however, he found no indications of neurological disease or trauma. Id. at 371-72. While Dr. Sesta did not see any indications of malingering, he did believe that Petitioner was careless and not exerting sufficient attention in some areas of the testing. Id. at 375. Dr. Sesta stated that Petitioner's imaginary friend "raised some question of disingenuous behavior, but aside from that [he] didn't see evidence of flagrant faking." Id. at 376. In Dr. Sesta's opinion Petitioner was not competent to stand trial because of his inability to appreciate the seriousness of his charges; he felt that Petitioner lacked a rational understanding of the situation. When describing the difference between rational and

factual understanding, Dr. Sesta explained:

> I think the best indication is when there's a split between what they say and what they do. I think the most flagrant example is when questioning the defendant about the penalties possibly imposed if convicted of this charge he was able to verbalize the factual knowledge, which was life without parole or facing capital punishment. However, at several points during the seven hour examination he would say, when I get out of here I want to do this. He'd speak of women he wanted to date when he got out. And basically what he was going to do when he was released from jail, which was patently inconsistent with having a rational appreciation of the penalties he faced.

Id. at 380. Dr. Sesta also believed that this impairment would affect Petitioner's ability to communicate effectively with his lawyer. Dr. Sesta noted that he had been observing Petitioner's behavior during the hearing ("playing with his shackles," "picking his fingers," and "playing with his ears"), and his guess was that he "is not monitoring or understanding a lot of what is going on in the courtroom today. I think it's going to impair his ability to assist counsel in challenging prosecution witnesses." Id. at 381. Dr. Sesta recommended that Petitioner be sent to a forensic psychiatric hospital where he could receive pharmacological treatment for his disorder which should restore his competency. Id. at 382.

On cross-examination, Dr. Sesta testified that Petitioner was lucid during his examination and seemed to understand his purpose for being there, although he did feel that there was a disingenuous quality to his behavior at some points. Id. at 384-85. Dr. Sesta found that Petitioner had average intelligence with an IQ of 94, and he found no indication of retardation, bipolar disorder, schizophrenia or other major mental illness. Id. at 385. He found that Petitioner had ADHD and also had a cognitive disorder not otherwise specified based on his poor verbal skills versus intact visual skills. Id. at 386. While he was not convinced that Petitioner was

malingering, he admitted that it was possible. Id. at 391. In addition to these expert witnesses, the defense called Petitioner's mother, grandmother and defense counsel, Robert Rand's, paralegal who testified that in her dealings with him Petitioner did not seem to appreciate the seriousness of the charges against him, but was more focused on irrelevant personal issues. Id. at 403-04.

The State called Dr. Thomas Conger, a clinical psychologist, who also conducted various tests on Petitioner and opined that he was competent to stand trial. Dr. Conger believed that Petitioner had the ability and memory functioning to assist his attorney more than he was showing. He was not certain whether Petitioner was malingering or not, but believed that it was certainly possible. Id. at 415; 417. With regard to Dr. Sesta's findings, Dr. Conger testified as follows:

> [w]e agree on the possibility that Mr. Hertz was not putting forth the maximum effort. That there was questions regarding his motivation to perform well. We agree on the verbal difficulties that he's had apparently throughout his life. We agree that many of his performances were within the average range on the testing that we administered. You have to understand that he also administered some tests different than my own, so we did not have a mirror image battery. But on the things that we did administer, we came out with very similar findings.

Id. at 414. As for the differences in their evaluations, Petitioner scored a little better on Dr. Conger's testing, with Dr. Conger putting him in a normal neuropsychological range and Dr. Sesta putting him in a borderline impaired range. Id. at 424.

The record reflects that all three medical experts testified that Petitioner had a factual understanding of the proceedings against him and was lucid and oriented. They all found that Petitioner had an attention deficit hyperactivity disorder, but none found a specific brain dysfunction or any other major mental illness. In fact, the defense experts both testified that with proper medication to control his hyperactivity

and attention deficits, Petitioner would be competent to stand trial. Furthermore, all three doctors stated that there could have been some level of malingering on Petitioner's part.

While the experts differed in their conclusions, the postconviction court resolved the dispute in its discretion, and the record of the competency hearing does not raise a substantial or legitimate doubt that this determination was unreasonable. While the defense attempted to show that Petitioner lacked a rational understanding of his legal situation, the evidence presented on this issue was far from compelling. The testimony indicated that Petitioner had an unrealistic view of the likelihood of his being found guilty of the murders based on the evidence against him. However, it is unclear how this unrealistic view of the probable outcome of his legal situation rendered him incompetent to stand trial.

The defense also argued that Petitioner was unable to assist in his own defense. However, the trial court observed Petitioner during the competency hearing and found that he did not display any signs of hyperactivity and appeared attentive. See OR Vol. III at 473. The trial court's assessment of Petitioner's demeanor is entitled to deference. Additionally, Petitioner has presented no evidence in his federal habeas petition that at any time during the trial he behaved abnormally or was unable to assist his attorneys. It is also worth noting that Petitioner testified during the Spencer hearing[7] held after the jury recommended his sentence of death. He expressed remorse for the crime and asked the court to sentence him to life instead of death. A review of his testimony reflects that Petitioner expressed himself clearly and

---

[7]See Spencer v. State, 615 So.2d 688 (Fla. 1993)( permitting the presentation of additional evidence to the trial judge, including evidence not presented to the jury, following the jury's advisory sentence).

coherently, recognizing the mistakes he had made in his life and wishing to help his brothers make better decisions in their lives.[8]

In conclusion, the trial record fairly supports the state courts' determination that Petitioner was competent to stand trial. The Florida Supreme Court properly applied Supreme Court law in this case. See Hertz I, 803 So.2d at 639-40. Petitioner has not presented sufficient evidence in his habeas petition to rebut the presumption of correctness applicable to state court determinations. The state courts' factual findings are supported by the evidence and must be given deference by this Court. Petitioner has failed to show that the state courts' rejection of this claim relied on erroneous facts, or applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent. Therefore, no habeas relief is warranted on this ground.

C.     Claim Three:   Ineffective Assistance of Counsel–Penalty Phase

Petitioner contends that he received ineffective assistance of counsel from his

---

[8]Petitioner testified as follows:

Because I know I'll never get out and be able to prove to the family that I'm really sorry for what happened to them, make a life out of myself, be able to give my mom grand kids from me or be able to carry on my name from my dad to me to another.

But sometimes things happen to bad–bad things happen to people that really don't deserve it. I'm sorry for what–all I can say–and I pray to the Lord that they hear my prayers too, that I'm really, really sorry.

But I know and the Lord knows I can't give my life up to bring them back. But all I ask is just to at least let me live out my years until I die. If it has to be in prison, so be it. But I want to be able to at least watch my little brothers grow up and be able to see if I have a niece or a nephew.

I want to be able to explain to my brothers what happened and be able to explain to them to choose who to be around and not who to be around, who the troublemakers are and who not the troublemakers are, be able to go out and give them an education and graduate from high school, which I never did, and I regret, and get a college education, and live their life without any trouble.

OR Vol. IV at 500.

Case No.: 4:06cv507-RS

attorneys, Robert Rand and Lynn Thompson, because they failed to present all of the mitigating evidence which existed during the penalty phase of his trial. He alleges that the following three statutory mitigators existed, but were never specifically identified by his counsel who only weakly presented the first two of them: (1) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (see Fla. Stat. § 921.141(6)(f)); (2) his psychological and mental age was no more than that of a fourteen year old (see Fla. Stat. § 921.141(6)(g)); and (3) the felonies were committed while he was under the influence of extreme mental or emotional disturbance (see Fla. Stat. § 921.141(6)(b)). Petitioner also alleges that Dr. Sesta, who testified during his competency hearing, should have been called to testify during the penalty phase of his trial. Petitioner believes that he suffered prejudice as a result of his counsel's ineffectiveness because had all available mitigation been presented, the jury would have determined that the mitigating factors outweighed the aggravating factors. Petitioner exhausted these claims in state court in his postconviction proceeding.

I.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Id., 466 U.S. at 687. It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof. Id. If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Id. at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, supra, 350 U.S. at 101, 76 S. Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. at 693. However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Id. at 693–94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland

for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  <u>Williams</u>, 529 U.S. at 405–406.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  <u>Strickland</u>, 466 U.S. at 694–95.

> "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."

<u>Id</u>. at 695–96.

In <u>Strickland</u>, the Court addressed a claim that counsel failed to adequately investigate and present mitigating evidence at trial.  The Court held that:

> "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make

> reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Id. at 690-91. The Court found that the petitioner had failed to establish deficient performance in Strickland. In contrast, in Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), the Court found that the record supported a determination that counsel's performance had been deficient, and it reaffirmed the principles announced in Strickland as follows:

> "[i]n light of these standards, our principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]"[Strickland at 691, 104 S. Ct. 2052], is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable. . . . In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," [Strickland at 688], which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time," [id. at 689]("[E]very effort [must] be made to eliminate the distorting effects of hindsight")."

Wiggins, 539 U.S. at 522-23. In determining whether an attorney has made a reasonable investigation in order to present mitigating evidence, a three-part analysis is used:

> First, it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. If the choice was not tactical and the performance was deficient, then it must be determined whether there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different.

Porter v. Singletary, 14 F.3d 554, 557 (11ᵗʰ Cir. 1994)(internal cites omitted).

The Eleventh Circuit has also held that "[a]fter a sufficient investigation, however, 'counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.'" Lightbourne v. Dugger, 829 F.2d 1012, 1025 (11th Cir. 1987)(internal citations omitted). Thus, "even when trial counsel's investigation and presentation is less complete than collateral counsel's, trial counsel has not performed deficiently when a reasonable lawyer could have decided, under the circumstances, not to investigate or present particular evidence." Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001). In other words, "trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(quotations omitted).

> The lesson to be drawn from our decisions is not that counsel's performance is always, or even usually, deficient if counsel fails to present available mitigating circumstance evidence. Nor is the lesson that the presentation of some mitigating circumstance evidence will always insulate counsel's performance from being condemned as ineffective. Instead, our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984), and its progeny.

Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995). See also, Stevens v. Zant, 968 F. 2d 1076, 1082 (11th Cir. 1992)("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel."). "No absolute duty exists to introduce mitigating or character evidence." Chandler, 218 F.3d at 1319; see also,

Crawford v. Head, 311 F.3d 1288, 1297 (11th Cir. 2002); Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004). "Considering the realities of the courtroom, more is not always better." Chandler, 218 F.3d at 1319. See Housel v. Head, 238 F.3d 1289, 1295 (11th Cir. 2001)(counsel not ineffective for failing to pursue mental health mitigation where counsel knew defendant had suffered a head injury, but observed nothing unusual about defendant's behavior); Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1348-50 (11th Cir. 2005)(rejecting ineffective assistance claim where defendant's mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel's possession showing defendant's brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence).

In reviewing a lawyer's professional judgments, "[a] decision to limit investigation is 'accorded a strong presumption of reasonableness.'" Mills v. Singletary, 63 F.3d 999, 1021 (11th Cir. 1995)(quoting Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987)). While this standard is a high one, the standard is even higher when experienced counsel is involved. ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.") Chandler, 218 F.3d at 1316.

To establish prejudice under Strickland, the petitioner must show that "but for" counsel's unprofessional errors, the result of the proceeding would have been different. In a case challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. In assessing prejudice, the reviewing court must consider the totality of the evidence and keep in mind that "a verdict or conclusion only weakly supported

by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.

  II.  Penalty Phase Mitigation

  In the penalty phase of the trial, Petitioner's defense attorneys presented one mental health expert and five other witnesses. Lead counsel, Mr. Rand, testified at the postconviction evidentiary hearing that at the time of Petitioner's trial he had tried in excess of 1,000 cases and between twelve and fifteen first-degree murder cases. PCR Vol. II at 387-88. He had represented defendants in three capital penalty phases. Id. at 388. Mr. Rand testified that along with his experienced co-counsel, Lynn Thompson, they conducted a thorough investigation into Petitioner's background:

> that encompassed all areas of his upbringing, everything from birth forward, including school records, medical records, psychological records, disciplinary records, criminal history, talked with relatives, people who knew him, tried to get as much information as possible to get some kind of read as to what issues might be available to us should there be a penalty phase.

Id. at 389-90. Mr. Rand testified that he felt that Petitioner had had a tragic life for a young man, and he selected the family members who could give a vibrant picture of his unfortunate childhood to testify. Id. at 391. In addition to the witnesses who testified, Mr. Rand compiled a life history exhibit which was admitted into evidence for the jury's perusal which included Petitioner's medical records, psychological records and pictures. OR Vol. XIX at 2396. Mr. Rand stated that he presented the information in that fashion because:

> I felt like Mr. Hertz had a story to tell in the penalty phase that was very compelling. I wanted the jury to have the underlying facts and the support for the argument we were making. I thought it was important that they have the ability to look hands-on at the bits and pieces of his life.

By the same token I felt like that the argument that we were making was one that needed not to bog down in minutia, in detail, in papers, in trivia. So I tried to give the jury both. I tried to give them the minutia and the paper on one hand in a form that they could take with them into the jury room, and I tried to create a mental image in their mind through argument of what this says and refer to it, I believe, during my closing argument a number of times that they should look at it, they should read it, they should understand what this young man went through. And so I tried to give them both and that's the way I chose to do it.

Id. at 399. Mr. Rand's penalty phase closing argument summarized the factors which he felt mitigated the crimes for which Petitioner had been convicted. In his closing statement, Mr. Rand said:

I talked briefly in my opening about parenting and how we all pride ourselves on having some effect on our children. And it's true. Sometimes you look at your kids and you're so proud and you say, I know why my kid did that, you know, because I've taught them right, I've helped them grow, I've made them a strong young man or a good, good young woman. I've taught them values. I've taught them respect for other people. I've taught them about life.

What did Mr. Hertz get taught? Look at that, it will tell you what he got taught. He got taught he was nothing. He was conceived to avoid a prison sentence for his parents. He was passed back and forth. He was treated with indifference. He was subject to violence and he grew up in spite of it.

He ended up dropping out of school, didn't receive medication, didn't receive treatment for his club foot. And you might go, you know, who cares, who cares about his club foot, who cares about ADHD. That's not exactly cancer or brain tumors. Who cares? And the truth is nobody really cared. And so when you go back and you deliberate about this and you look at these materials, you can do what has happened to Guerry Wayne Hertz at every stage of his life and that's put him down. I don't care, he did a bad thing and he's going to pay with his life.

But I want you to look at these pictures of this little boy and I want you to look at the pain in his eyes. And I want you to see that this child was not the children that we see growing up in our families. He was not the child that grows up in a healthy, happy, normal family. You look at the pain in the eyes of this little boy as he grows up and you'll have some idea of why Guerry Wayne Hertz turned out the way he did.

Does that excuse what he did? Absolutely not. And I would certainly never, never ask you to do that and certainly never, in the presence of these families, ask you to excuse these acts. But it does help you to understand, and that is all that we can hope for, is understanding of what went on, understanding of how we made these young men and how we contributed, in terms of their families, their education, their medical treatment, their psychological treatment, to the development that led them to who they are today.

OR Vol. XIX at 2397-99.

A sampling of the testimony presented during the penalty phase gives a portrait of Petitioner's childhood which his counsel felt mitigated these crimes. Petitioner's mother, Deborah Hertz, who is deaf, testified that she and Petitioner's father were taking drugs while dating and were arrested for stealing to support their drug habit. OR Vol. XIX at 2262. Mrs. Hertz testified that she decided to get pregnant because it was her understanding that they would avoid jail time if she were pregnant, and that she married after becoming pregnant. Id. at 2263. When asked by Mr. Rand whether her husband hit her when she was pregnant, Mrs. Hertz testified as follows:

A. Yeah, he would hit me, he'd–I actually started hitting myself in the stomach. In the bathroom I would hide and just punch my stomach. It would make me cry because we would be arguing and I would just punch my stomach, and that's what I did.

Q. Why would you punch your stomach; to end your pregnancy?

A. Yeah, I didn't want to be pregnant any more.

Q.      And so you tried to end the pregnancy that way?

A.      Yeah, I wanted to end the pregnancy.  I was very angry.

Id. at 2264-65.  She testified that her son, whom she refers to as Wayne, was cared for sporadically by her parents after his birth and that his clubfoot, a genetic defect, was not consistently treated.  Mrs. Hertz's description of her marriage included ongoing physical abuse and  continual drug use, including crack cocaine use which was witnessed by her son.  Id. at 2270.  Mrs. Hertz stated that her son would witness the physical abuse between his parents and get upset.  Id. at 2268.  As an example of the abuse, Mrs. Hertz said that "when we would fight [my husband] would jump on top of me on the couch, get on top of me.  I would struggle and he would choke me and I couldn't–until I actually couldn't breathe.  And he'd do that over and over again.  It was very scary.  I would cry and then he'd walk away."  Id. at 2268.  Mrs. Hertz stated that her husband would hit her son "until he was purple on his bottom."  Id. at 2268-69.  She described another incident when Petitioner was 13 years old "[a]nd I saw that [his father] was on top of him and he was on his leg and he was beating him up.  I said, you know, you shouldn't be getting on top of him like that. . . . And Wayne was there crying and his leg was all bruised."  Id. at 2273.  Mrs. Hertz stated that the couple was together on and off even after they divorced until her son told her to end the relationship permanently.  Id. at 2270-71.

With regard to Petitioner's ADHD, Mrs. Hertz stated that she did not really understand what was going on, and she did not always give him his medication.  In fact, on direct examination by Mr. Rand she testified that Mr. Hertz did not want their son to take Ritalin:

Q.      Was his father willing to give him the medication?

A.    No, his father would tell me not to give him the medication, would force me not to give him the medication.  He would actually hold off the medication.  He said–he would tell him it's not–that it's like candy, that it wasn't a drug for him to use.  So he would tell me not to do it.  So I needed to control his behavior on my own.

Q.    Okay.  Now, during this same time that he wouldn't give him the prescription drug, did you become aware that Wayne's father was giving him marijuana and other drugs?

A.    I wasn't aware.  Wayne told my mom at eight years old he was smoking pot and they were hiding it from me.  Because I would have told him no, that I wouldn't let him smoke pot, no.  I didn't know that he was giving him drugs.  I was told that he was smoking, and I had no knowledge of it.

Id. at 2277-78.

Petitioner's father, Guerry Wayne Hertz, Sr., who is also hearing impaired, testified that he used marijuana, hash, quaaludes, cocaine and acid during his marriage and had begun huffing paint and glue at ten years of age.  Id. at 2281-83.  Mr. Hertz testified as follows when questioned on direct by Mr. Rand:

Q.    All right, and you didn't have a baby because you wanted a baby, you had a baby because you didn't want to go to prison?

A.    Yes, sir.

Q.    Okay.  Now, within a few weeks of having the baby–when the baby was born–strike that.  When the baby was born, did he have any physical problems?

A.    Yes, sir, he had a club foot.

Q.    You didn't like having a child with a defect, did you?

A.    Yes, sir.

Q.      Okay, you're handicapped yourself, and you wanted a perfect child, didn't you?

A.      That's correct.

Q.      Okay, and you held that against him?

A.      Yes, sir.

Id. at 2284.  Mr. Hertz admitted to hitting his wife during their marriage, even while she was pregnant.  Id. at 2288.  He also testified about being homeless for eighteen months and living in a van when Petitioner was young because they spent all of their money on marijuana and crack cocaine.  Id. at 2287.  Mr. Hertz admitted that he was not a good father and that his son had a bad childhood.  Id. at 2289-90.  With regard to giving him drugs, Mr. Hertz testified as follows:

Q.[MR. RAND]:  . . . . When Wayne was eight years old, did you begin to teach him about drugs?

A.[MR. HERTZ]: Yes, sir.  I took him out–we were going to go swimming and–

Q.      Do what?

A.      Go swimming and we went down the road and I gave him some.

Q.      You gave him some marijuana?

A.      Yes, sir, I gave him a couple, two or three puffs until he was high, real hyper.

Q.      And so he got high, a little eight-year-old boy getting high?

A.      Yeah.

Q.    All right.  And over time you shared other drugs with him, too, right?

A.    Yes, sir.

Q.    And you began to take acid, too, didn't you?

A.    Yes, sir.

Id. at 2290.  With regard to his son's ADHD, Mr. Hertz  testified that even though he was better behaved while on Ritalin, he would not let him take the medication and in fact hid it from him.  Id. at 2291.

In addition to testimony from Petitioner's parents, Mr. Rand also published an affidavit from one of Petitioner's elementary school teachers in which she stated that she learned that the Hertzes were homeless and living in a van, and she remembered Wayne as dirty, hyperactive and unhappy.  Id. at 2297.  Petitioner's grandmother, Iris Watson, also testified and confirmed much of what his parents had related, including their drug use and her grandson's largely untreated ADHD.  See id. at 2299-2304.  Petitioner's paternal aunt testified that when Petitioner was young she saw him often and that he was really dirty and generally uncared for.  Id. at 2306.  She testified that when he was on Ritalin "[i]t was like a night and day difference.  I mean, you could tell him to do something and he would respond," but his parents did not make sure he was on the medication.  Id. at 2306-07.  She also testified that her other brother, Petitioner's uncle, told her that he used crack cocaine with Petitioner while they were living together in 1997.  Id. at 2309.

Mr. Rand also called Dr. D'Errico to testify during the penalty phase proceeding. Petitioner makes several claims as follows with regard to this evidence.

1.    The Diminished Capacity Mitigator

With regard to the statutory mitigator of diminished capacity, Petitioner contends that Dr. Sesta's findings that he has a frontal lobe deficit should have been presented during the penalty phase of his trial to explain that his capacity to control his behavior was substantially impaired.

a.    <u>State Proceedings</u>

The state courts denied relief on this claim.  In its sentencing order, the trial court found that Petitioner's capacity to appreciate the criminality of his acts or to conform his conduct to the requirements of the law was a mitigating factor.  The trial court, however, afforded the factor only "some weight" explaining as follows:

> [w]ith respect to the defendant's mental status and his attention deficit disorder, the Court is reasonably convinced that the defendant has this disorder which has been so diagnosed but finds that his condition was adequately attended by medication.  It is also noted that in two competency hearings, this Court as well as another circuit court in Florida have found the defendant was competent and have so ruled.  The evidence does not support any finding or conclusion that the capacity of the defendant to conform his conduct to the requirements of the law and to appreciate the criminality of his conduct was substantially impaired, accordingly, while entitled to some weight it was not entitled to moderate weight.

Hertz II, 941 So.2d at 1038.  The Florida Supreme Court, noting that the decision of the trial court on this issue is entitled to reasonable deference, found as follows:

> [i]t is clear from the record that trial counsel presented during the penalty phase ample evidence of the mental health problems and history Hertz experienced.  His mother and grandmother both testified that Hertz had been diagnosed as having Attention Deficit Hyperactivity Disorder ("ADHD").  Evidence was presented that his behavior improved markedly when he was taking the Ritalin the doctors prescribed but he was not consistently provided the medication.  In addition to lay testimony, Rand also presented expert testimony from Dr. D'Errico.  After personally examining Hertz and reviewing all of his records, both mental health and otherwise, Dr. D'Errico agreed that the ADHD diagnosis was correct.  Dr.

D'Errico also addressed cognitive testing that he performed which revealed a 39-point differential in performance and verbal IQ scores. In explaining the significance of this disparity, Dr. D'Errico was of the opinion that although this point differential would "suggest to me that some brain damage had occurred . . . [a]fter a neuropsychological evaluation . . . it was apparent that the difference was due to developmental reasons . . . [because] he was raised in a home where spoken language was not used." (Emphasis added.)

The current assertion that the testimony of Dr. Sesta would have provided more compelling evidence as to the diminished capacity mitigator is refuted by the record. Although Dr. Sesta did testify during the competency hearing with regard to "flagrant deficits in frontal [lobe] functions," he later elaborated that the 39-point IQ differential on which he based this conclusion represented "a neurodeficit developmental disorder . . . consistent in part with some of the defendant's upbringing in a nonverbal household, being raised by deaf parents, as well as the presence of other forms of psychiatric disorder, ADHD and learning disability." On cross-examination, Dr. Sesta testified that he found no indication of retardation, borderline intellectual functioning, or Axis I major mental illness. Dr. Sesta described Hertz as having a "cognitive disorder not otherwise specified which is–which described the functioning of his brain that we discussed earlier with his poor verbal skills versus intact visual skills and the frontal lobe deficits that he had."

Hertz II, 941 So.2d at 1038-39. The supreme court also found that even if the trial court's assessment of Dr. Sesta's diagnosis is in dispute, Petitioner's trial counsel had a valid strategic reason for not calling Dr. Sesta as a witness in the penalty phase.

'After seeing what happened to Dr. Sesta on cross-examination . . . [Rand] decided that the doctor was not a good witness and not that helpful. Among other things, Dr. Sesta testified as to possible frontal lobe damage on direct examination, then essentially backed off that testimony upon cross-examination.'

Additionally, Dr. Sesta admitted on cross-examination that Hertz could

"certainly" be faking his test results by performing well when he chose to do so.

Hertz II, 941 So.2d at 1039 (quoting Order Denying Rule 3.851 Motion of the Defendant at 8). The Florida Supreme Court, therefore, concluded that:

> [i]n the instant case, Rand made a strategic decision that he would not use Dr. Sesta as a witness at the penalty phase because Dr. Sesta had not been a good witness at the competency hearing. Rand was of the view that on cross-examination during the competency hearing, Dr. Sesta had retracted his conclusion that the IQ score differential indicated that Hertz had frontal lobe damage. Rand's decision is supported by the trial court's observation that Dr. Sesta did not find any brain "damage." The poor performance of Dr. Sesta on cross-examination during the competency hearing and the trial court's conclusion that Dr. Sesta found no brain damage demonstrate that the decision to not use Dr. Sesta as a witness at trial was clearly within "the broad range of reasonably competent performance" contemplated by the Supreme Court in Strickland and does not undermine our confidence in the outcome of the proceedings below. See Strickland, 466 U.S. at 687, 694, 104 S. Ct. 2052.

Hertz II, 941 So.2d at 1040.

> b.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth supra.

> c.    Federal Review of Claim

During the pretrial competency hearing, Dr. Sesta testified that he saw "flagrant deficits" in Petitioner's frontal lobe functions. OR Vol. III at 371. When asked how these deficits related to Petitioner's behavior, Dr. Sesta testified:

> [t]he frontal lobe, basically, one of my neuroanatomy professors used to state that the frontal lobe is what separates the behavior of the five year old from the behavior of the 30 year old. It essentially provides the breaks for human behavior. Other areas of the brain provide motivation, violence, aggression, sexual things and the frontal lobes essentially are often called

the executive of the brain. They basically mediate behavior and determine an appropriate forum to ventilate our urges. They basically break or inhibit inappropriate behaviors.

Id. at 372. While Dr. Sesta testified to flagrant frontal lobe deficits on direct questioning, a review of the record supports the state courts' determination that on cross-examination, Dr. Sesta backtracked on some of his earlier statements and seemed to agree with most of the points made by the State, most significantly that he did not find any brain damage and that Petitioner's neurological problems may have been the result of being raised in a non-verbal household as well as his attention deficit and hyperactivity disorder. See OR Vol. III at 383-92; see also Order Denying Rule 3.851 Motion of the Defendant at 6.

At the evidentiary hearing during the postconviction proceedings, Mr. Rand testified that while Dr. Sesta made the points he wished regarding Petitioner's mental condition during his direct testimony, he ended up retracting much of what he had testified to on cross-examination. Mr. Rand stated:

. . . Mr. Meggs I believe did the cross examination and almost point by point Dr. Sessta [sic] retracted what he had said in his report and what he had said to us and made his conclusions essentially ineffective and his testimony, therefore, was ineffective.

And I was quite disappointed at the result, the end result, of both his testimony and the competency hearing. I thought we had a pretty good shot at the competency issue going in, and, in fact, we ended up losing that issue and I don't think Dr. Sessta [sic] provided much support.

PCR Vol. II at 369. Mr. Rand felt that Dr. D'Errico could effectively bring out the salient points regarding the examinations that both doctors had conducted, so he decided to use him in the penalty phase. Mr. Rand had worked on other cases with Dr. D'Errico and had found him to be a good witness; "he had the best chance of relating Mr. Hertz's

background and medical history in a fashion that people could relate to and wasn't overly clinical." Id. at 397. Furthermore, Mr. Rand felt that the court would not appoint another mental health expert because Petitioner had been previously examined by three experts. Id.

Because Dr. Sesta was not a good witness for Petitioner during the competency proceeding, Mr. Rand, an experienced trial counsel, made a reasonable strategic decision not to call him as a witness during the penalty phase. The state court found that Petitioner did not demonstrate that his counsel's decision not to call Dr. Sesta as a witness during the penalty phase of the trial was outside of "the broad range of reasonably competent performance" contemplated by Strickland. Petitioner has failed to demonstrate in his habeas petition that the state courts' decision on this issue is contrary to or an unreasonable application of Strickland and the cases interpreting Strickland.

Furthermore, "[a]fter a sufficient investigation, . . . 'counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.'" Lightbourne v. Dugger, 829 F.2d at 1025 (internal citations omitted). In this case, Mr. Rand made a reasonable investigation into Petitioner's background and mental health. He testified that he reviewed Petitioner's medical records, psychological records, disciplinary records and Petitioner's prior criminal history. Mr. Rand also obtained two experts to review Petitioner's competence and used their testing and evaluations to determine any existing mental health mitigation for the penalty phase of the trial. Petitioner's defense counsel called Dr. D'Errico to testify about Petitioner's ADHD and other mental health problems. Dr. D'Errico also testified about Petitioner's childhood history of physical abuse and problems with his club foot which he believed led to Petitioner's psychological problems.

The record of Dr. Sesta's testimony during the competency hearing does not support Petitioner's argument that his trial counsels' failure to call Dr. Sesta as a witness in the penalty phase was an error that no competent counsel would have made, or that there is a reasonable probability that "but for" counsels' failure to raise the claim, the result of the trial would have been different. In sum, the state court's findings of fact are fairly supported by the record, and according them a strong presumption of correctness, and evaluating the reasonableness of counsel's performance from counsel's perspective at the time, Petitioner's counsels' performance at the penalty phase of his trial was reasonable. Since Petitioner has failed to meet the first prong of Strickland, the second prong of the analysis, whether Petitioner was prejudiced, need not be addressed. See Strickland, 466 U.S. at 697. The state courts properly denied relief on this claim. Therefore, no habeas relief is warranted on this ground.

2.   The Extreme Mental Illness Mitigator

Petitioner contends that the capital felonies were committed while he was under the influence of an extreme mental or emotional disturbance. He alleges that evidence of this aggravator was available to his counsel in medical and mental health records prior to trial, but his counsel failed to appreciate the importance of this information.

a.   State Court Proceedings

The state courts denied relief on this claim. In his postconviction evidentiary hearing, Petitioner's collateral counsel presented the testimony of Dr. Bill Mosman, a forensic psychologist, who testified that Petitioner suffered from incurable organic brain damage which had a genetic origin. The postconviction court found that:

> [w]ith respect to his asserted statutory extreme mental disturbance mitigator, [Dr. Mosman] opined that he found "no data to suggest emotional disturbance, mental illness, any of those issues, the data certainly suggests mental disturbance separately." Dr. Mosman, however,

gave no specific indication within "the data" on which he was relying on to support these assertions nor did he point out any specific facts of the defendant's behavior during the criminal episode showing that his asserted mental condition contributed to his criminal behavior.

Order Denying Rule 3.851 Motion of the Defendant at 4-5. Additionally, the postconviction court found that:

> [t]here is no evidence in the record to lend weight that any mental age or extreme mental disturbance mental health mitigator asserted by Dr. Mosman, as either statutory or nonstatutory, contributed to the defendant's actions in committing his crimes. Dr. Mosman's testimony likely would have been entitled to insignificant weight had it been presented in the penalty phase. . . . The defendant has simply presented an additional mental health expert with different conclusions than those of the expert relied upon by trial counsel. There has been no convincing demonstration that the evaluation of trial counsel's expert was insufficient.

Id. at 10-11. The postconviction court also found that Petitioner's trial counsel "conduct[ed] a very thorough and reasonable investigation of mental health mitigation prior to trial and made a strategic and reasonable decision as to presenting this information through the mental health expert he utilized." Id. at 10.

The Florida Supreme Court affirmed the postconviction court's denial of relief, noting that it has "repeatedly emphasized that a reasonable investigation into mental health mitigation 'is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.'" Hertz II, 941 So.2d at 1040 (quoting Asay v. State, 769 So.2d 974, 986 (Fla. 2000)). Furthermore, the court found that the opinion of the postconviction court on the credibility of Dr. Mosman was supported by competent, substantial evidence as follows:

> Upon cross-examination, Dr. Mosman admitted that he had not read the defendant's guilt phase trial transcripts but had read only the penalty phase . . . .

He also admitted that he had not read the defendant's competency hearing transcripts during which three doctors: Dr. D'Errico, Dr. Sesta, and Dr. Conger, testified, nor had he read the competency hearing evaluation. He talked to Dr. Sesta and reviewed his report, but had not talked to Dr. D'Errico or Dr. Conger, nor read their reports. . . .

[He] further acknowledged that he had not talked to the defendant's trial attorney, Robert Rand, with respect to his presentation of the defendant's mitigation, had not read defense counsel's argument, had no knowledge of and had not read the exhibit introduced into evidence and argued by Mr. Rand during the penalty phase which compiled a complete, detailed and extensive history of the defendant's background and all of his records, and also conceded that he did not know everything that the defendant's trial attorney presented.

Hertz II, 941 So.2d at 1041. The court found that based on the record Petitioner's defense counsel conducted a reasonable investigation into mental health mitigation.

> b.   Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth supra.

> c.   Federal Review of Claim

During the penalty phase of the trial, defense counsel called Dr. Michael D'Errico as its mental health expert witness. Dr. D'Errico testified that Petitioner had been diagnosed with ADHD when he was thirteen years of age. OR Vol XIX at 2315. He also reviewed his findings with regard to Petitioner's mental health. Dr. D'Errico testified on direct questioning by Mr. Rand that he conducted several tests on Petitioner including an intelligence test, and he found that:

A.   Mr. Hertz' verbal ability on a verbal scale was 39 points less than his abilities on the performance scale. Most of–this is a very significant difference and it's probably–I would have to say that, you know, in just looking at the test, it would suggest to me that

some brain damage had occurred.

After a neuropsychological evaluation, however, it was apparent that the difference was due to developmental reasons. In other words–

Q.    Developmental reasons meaning what?

A.    He was raised in a home where spoken language was not used. He also suffered from attention deficit hyperactivity disorder that was sometimes treated and most of the time not treated. So his abilities to comprehend and use language, and his abilities that he would obtain for his age level from paying attention in school were much less, much less than his abilities to do performance tasks.

Q.    And you think at least a portion of that is related to being raised with deaf parents?

A.    I'd say the majority of it would be.

Id. at 2319-20. Dr. D'Errico also testified that Petitioner was effected by other stressors including:

. . . his history of child abuse, physical abuse, being striken–struck by his parents, by his father, being humiliated, I would think, would be major factors. I think the fact that he was born with a club foot, although it was a physical problem, would have psychological ramifications, especially when he was younger and had to deal with this problem, as far as resulting in his experiencing a low self-esteem or poor self-image.

Id. at 2318.   On cross-examination, Dr. D'Errico testified that while Petitioner may understand the consequences of his actions, "the impulsivity that is associated with attention deficit hyperactivity disorder may have interfered with his ability to fully appreciate the consequences." Id. at 2323.

During the postconviction evidentiary hearing, Dr. Mosman testified that

Petitioner's 39 point difference in the verbal and performance IQ test was not a result of being raised in a predominantly deaf home, but was indicative of organic brain damage, possibly genetic in nature. PCR Vol. II at 347. Dr. Mosman testified that Dr. D'Errico is not a neuropsychologist and that he misinterpreted the tests performed on Petitioner. Id. at 380. However, Dr. Mosman testified when cross-examined as follows:

Q. [By Mr. Evans for the State]: Now, as for the issue of using [the Weschler System] for diagnosis of brain damage, it's not definitive, is it, that says just because they score this way that the person, in fact, has brain damage?

A. No. You are absolutely correct. There are other explanations that you have to weigh and balance and factor in also.

Q. So while it may suggest it, it is not conclusive just based upon the Weschler exam that a person does have brain damage or not?

A. No, that's very true. Just like any test, a thermometer says a temperature of 107, doesn't mean that you have an infection. You know, the scores themselves have–you have to have more information and rule in and rule out other explanations, too.

Q. Are you aware of any type of brain scan or anything such as that that has been given to the defendant to indicate definitively that there is, in fact, brain damage?

A. No, I'm not aware of that at all.

Q. So I guess the bottom line is Dr. D'Errico interpreted what the data was in one direction and you're interpreting it in another direction?

A. I would agree with that, yes.

Id. at 383-84.

While Dr. Mosman testified that Dr. Sesta had found indications of brain damage

(see id. at 349-50; 384-85), the postconviction court found as follows:

> [t]he record reflects that Dr. Sesta, a neuropsychologist did not find brain "damage." His testing found the defendant with an IQ score of 94 falling within the average range. He found "no indication of neurological disease or trauma;" no indication of "retardation," or "borderline intellectual functioning," or any major Axis I mental illness. He gave him a diagnosis of "cognitive disorder not otherwise specified" to describe the functioning of the defendant's brain with his poor verbal skills and frontal lobe deficits that he had found. His final analysis was that the defendant had a "neurodeficient developmental disorder." He interpreted this "as being consistent with in part some of his upbringing in a non-verbal household, being raised by deaf parents, as well as his ADHD and learning disability which indicated brain dysfunction." Dr. Sesta's testing reflected a neurological deficient score of 33 falling in the range of mild brain impairment with an impairment index of .7 in the borderline slightly impaired range. Dr. Conger's testing as testified to by him reflected a neurological deficient score of 24 and an index impairment of only .3 in almost normal range.

Order Denying Rule 3.851 Motion of the Defendant at 6.

Dr. Mosman testified that his review of Petitioner's case was primarily limited to his medical records and history; he did not read the exhibit the defense introduced which included Petitioner's life history. He also admitted on cross-examination that much of what he believed had not been put before the jury had actually been put into evidence. See id. at 363-369. The postconviction court found that:

> [Dr. Mosman's] asserted additional statutory mitigators are without basis in the record and clearly conflict with the evidence of the defendant's conduct and behavior presented during trial. He was not familiar with the significant facts and circumstances or the evidence presented during the guilt phase and his assertions of the mitigation was somewhat conjectural. Dr. Mosman essentially presented no other supportable credible mitigation that would have been found that was not presented by trial counsel through the expert and lay witnesses presented. . . .The penalty phase jury was aware of most, if not all, of the mitigation regarding the defendant's

background and childhood.

Order Denying Rule 3.851 Motion of the Defendant at 11.

The fact that Petitioner's collateral counsel has now secured arguably more favorable testimony of mental health mitigation from Dr. Mosman does not render Petitioner's trial counsel's investigation into mental health mitigation ineffective. See Davis v. Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997)("mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."). Petitioner's counsel obtained two mental health experts to examine him and to provide them with information useful to both his competency hearing and in mitigation should the trial go to a penalty phase. There has been no evidence to suggest that counsel was deficient for relying upon the opinions of these experts nor was it unreasonable to not seek out a third expert. Counsel is not required to shop for an expert who will testify in a particular way. See Card v. Dugger, 911 F.2d 1494, 1513 (11th Cir. 1990); Pace v. McNeil, 556 F.3d 1211, 1220-21 (11th Cir. 2009). Furthermore, the postconviction court found Dr. Mosman's testimony would have been entitled to "insignificant weight" had it been presented. See Order Denying Rule 3.81 Motion of the Defendant at 11.

Petitioner has failed to show that his trial counsels' failure to secure additional mental health testimony was an error that no competent counsel would have made, or that there is a reasonable probability that "but for" counsels' failure to raise the claim, the result of the trial would have been different. Defense counsel presented a mental health expert who testified regarding Petitioner's medical and mental health issues. Additionally, defense counsel admitted into evidence Petitioner's life history in the form of a comprehensive exhibit which included portions of his medical records and other

aspects of his mental state. The Florida Supreme Court's conclusion that counsels' performance did not rise to the level of constitutionally ineffective performance is not an unreasonable application of <u>Strickland</u> and the cases interpreting <u>Strickland</u>.

In sum, the state court's findings of fact are fairly supported by the record, and according them a strong presumption of correctness, and evaluating the reasonableness of counsel's performance from counsel's perspective at the time, Petitioner's counsels' performance at the penalty phase of his trial was reasonable. Since Petitioner has failed to meet the first prong of <u>Strickland</u>, the second prong of the analysis, whether Petitioner was prejudiced, need not be addressed. <u>See</u> <u>Strickland</u>, 466 U.S. at 697. The state courts properly denied relief on this claim. Therefore, no habeas relief is warranted on this ground.

### 3. The Statutory Age Mitigator

Petitioner contends that while he was chronologically twenty years old at the time of the commission of these crimes, he had a psychological and mental age of a fourteen-year old. Petitioner alleges that had his defense counsel presented the age mitigator properly, the jury would not have recommended that he be sentenced to death.

### a. State Court Proceedings

Petitioner raised this issue in his postconviction proceeding. The postconviction court denied relief, and the Florida Supreme Court affirmed holding that:

> [t]he trial court found Dr. Mosman's testimony with regard to the mental age of the defendant to be unpersuasive and concluded that there was no evidence in the record which would lend weight to the notion that any mental age mitigator was applicable.

> A statutory age mitigator was found by the trial court and given "only moderate weight" "in light of all the facts and circumstances" surrounding the crime. Rand testified at the evidentiary hearing that Dr. Mosman's

testimony in postconviction was the first he had heard of Hertz having a mental age of fourteen. This Court has stated that trial counsel is not "ineffective for failing to pursue every possible defense based on a particular mental condition." Jackson v. Dugger, 547 So.2d 1197, 1200 (Fla. 1989). Additionally, this Court has stated that "[c]ounsel cannot be deemed ineffective. . . simply because he relied on what might have been less than complete pretrial psychiatric evaluations." State v. Sireci, 502 So.2d 1221, 1223 (Fla. 1987). Even if Dr. Mosman's conclusion as to the mental age of Hertz was correct, Rand would not have been ineffective for relying on the expert evaluation by Dr. D'Errico, who did not make such a finding.

Defense counsel was unaware of any theory that the defendant's possible mental age was fourteen, and the trial court found Dr. Mosman's testimony on this point not to be credible. Therefore, in our view, Rand was not ineffective for failing to present this mitigator, and our confidence in the proceedings below is not undermined by Rand's failure to present this issue at the penalty phase.

Hertz II, 941 So.2d at 1042.

b.    Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth supra.

c.    Federal Review of Claim

A review of the record supports the state courts' determination with regard to this mitigator. Significantly, the trial court did give Petitioner's age moderate weight as a mitigator. See Hertz I, 803 So.2d at 637. Petitioner argues that had additional evidence been presented on the issue of his mental age, the jury would not have recommended death. However, the postconviction court did not find the testimony presented by Dr. Mosman on this issue persuasive. The postconviction court found that "[t]here is no evidence in the record to lend weight that any mental age or extreme mental disturbance

mental health mitigator asserted by Dr. Mosman, as either statutory or nonstatutory, contributed to the defendant's actions in committing his crimes." Order Denying Rule 3.851 Motion of the Defendant at 10.

While Dr. Mosman testified "[t]he data indicates, without question, across over twenty years of testing the presence of brain damage, that when you look at those areas that the brain and the thinking that are responsible for thinking, considering, judging, has always been stable at fourteen years of age," he did not present the data or give any evidentiary support for this conclusion. PCR Vol. II at 345. Furthermore, none of the other medical experts who examined Petitioner reached this same conclusion.

Even if the jury would have been persuaded by Dr. Mosman's testimony had it been presented during the penalty phase, Petitioner has not demonstrated that his attorney's failure to present additional evidence on this issue rises to the level of constitutionally deficient assistance of counsel. Mr. Rand testified at the evidentiary hearing that he was not informed by his medical experts that Petitioner had a mental age less than his chronological age. He testified that he "relied on [Dr. Sesta's] assessments to bring me the relevant conclusions." PCR Vol. II at 408. The postconviction court found that Mr. Rand had not considered mental age "because it was never brought up by any of the doctors and was only first mentioned at the evidentiary hearing; and that he relied upon his experts, Dr. Sesta and Dr. D'Errico, neither of whom ever made any mention in any report or in any discussion about any mental age of fourteen of the defendant." Order Denying Rule 3.851 Motion of the Defendant at 10. Petitioner has presented no evidence to suggest that Mr. Rand had information regarding his mental age but chose to ignore it. The state court's conclusion that Mr. Rand reasonably relied on his mental health experts for information regarding this mitigator is supported by the record.

Case No.: 4:06cv507-RS

In conclusion, the state court's findings of fact are fairly supported by the record, and according them a strong presumption of correctness, and evaluating the reasonableness of counsel's performance from counsel's perspective at the time, Petitioner's counsels' performance at the penalty phase of his trial was reasonable. Since Petitioner has failed to meet the first prong of Strickland, the second prong of the analysis, whether Petitioner was prejudiced, need not be addressed. See Strickland, 466 U.S. at 697. The state courts properly denied relief on this claim. Therefore, no habeas relief is warranted on this ground.

4.    The Nonstatuory Mitigation

In his final claim of ineffective assistance of counsel, Petitioner contends that there was substantial proof of at least five non-statutory mitigators that were not presented to the jury or the court pursuant to Fla. Stat. § 921.141(6)(h). According to Petitioner, these non-statutory mitigators are as follows: (1) the ability to be rehabilitated in an incarcerated environment and to be a positive, functional person therein; (2) the existence of several genetic defects, resulting in color-blindness and a clubfoot; (3) organic brain damage; (4) medical problems, including four surgeries that disrupted his academic development and peer group relationships; and (5) a history of drug and alcohol abuse. (Doc. 1 at 31-32).

a.    State Court Proceedings

The postconviction court denied relief on this claim, and the Florida Supreme Court affirmed, holding as follows:

> [t]he assertion that Hertz had the ability to be rehabilitated or to be a positive person in the prison system was refuted by several facts established at trial. The State established that Hertz was in violation of felony probation on the date of the murders in the instant case and he was also involved in a shootout with police in an attempt to escape

apprehension after he committed the murders. See Hertz, 803 So.2d at 636.

Rand presented ample evidence of genetic defects, specifically the clubfoot condition. Family members testified that Hertz was born with a clubfoot which was difficult to correct partially because of their own medical neglect. The trial court even mentioned the struggles Hertz encountered with this condition in the sentencing order, stating that "[e]vidence and argument was presented that the defendant was born with a physical disability (club foot)." The trial court considered this genetic defect and "was reasonably convinced that the defendant did suffer hardships during his youth and should be given significant weight."

Hertz alleges that Rand failed to present evidence of his brain damage. As mentioned above, this alleged "brain damage" theory was presented by Dr. Mosman at the postconviction evidentiary hearing. The trial court found Dr. Mosman's testimony unconvincing. Even if the trial court had found Dr. Mosman's opinion on this point convincing, it still would have simply been a more favorable opinion of a new and different doctor postconviction which would not have rendered Rand's reliance on other expert opinions ineffective assistance of counsel. See Asay v. State, 769 So.2d at 986. Additionally, ample evidence of the mental health problems was in fact presented through the testimony of Dr. D'Errico during the penalty phase.

In a similar manner, the family history of deafness was presented at trial. The trial court specifically mentioned in the sentencing order that Hertz was born to a deaf mother and a partially deaf father. This was considered as part of a difficult childhood to which the trial court gave significant weight in terms of mitigation.

Evidence of the long history of drug abuse was also presented at trial. Family members all testified that his parents were both drug addicts and would steal to support their drug habits. His father even testified that he gave Hertz marijuana when Hertz was only eight years old. Again, the trial court considered in the sentencing order that Hertz's parents were "addicted to drugs and unable to provide a stable environment" for him.

* * *

> In our view, all of the nonstatutory mitigation which is now advanced as having not been presented at trial was, in fact, presented during the penalty phase. Defense attorney Rand clearly provided effective representation on this point and our confidence in the outcome of the proceedings below is not undermined.

Hertz II, 941 So.2d at 1043. With regard to Mr. Rand's method of presenting the mitigation evidence, the Florida Supreme Court considered it a matter of trial strategy which was within the bounds of effective assistance of counsel. See Hertz II, 941 So.2d at 1044-45.

### b. Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel are set forth supra.

### c. Federal Review of Claim

A review of the record clearly demonstrates that Mr. Rand, an experienced attorney, made a reasonable investigation into Petitioner's background in order to present mitigating factors to the jury. He obtained medical experts to evaluate Petitioner's mental health; obtained school, medical and mental health records; and interviewed family members and others who could provide mitigating evidence. Mr. Rand presented a comprehensive picture of Petitioner's bleak childhood through testimony and the life history exhibit placed into evidence during the penalty phase of the trial. Finally, a review of the penalty phase record supports the state court's conclusion that Mr. Rand presented most of the evidence which Petitioner contends he failed to present.

Given the horrific nature of the crimes committed; the number of aggravators found, particularly the CCP and HAC aggravators; and the overwhelming evidence of

Petitioner's guilt, Petitioner has not made a persuasive showing that the jury would more likely than not have recommended a life sentence had the additional mitigation suggested by Petitioner been presented. The state court's findings of fact are fairly supported by the record, and according them a strong presumption of correctness, and evaluating the reasonableness of counsel's performance from counsel's perspective at the time, Petitioner's counsels' performance at the penalty phase of his trial was reasonable. Since Petitioner has failed to meet the first prong of Strickland, the second prong of the analysis, whether he was prejudiced, need not be addressed. See Strickland, 466 U.S. at 697. The state courts properly denied relief on this claim. Therefore, no habeas relief is warranted on this ground.

D. Claim Four: Florida's Method of Execution is Cruel and Unusual

In Petitioner's final claim for relief, he alleges that Florida's method of execution by lethal injection violates the Eighth Amendment's prohibition against cruel and unusual punishment. This claim will be denied for the foregoing reasons.

The Supreme Court has held that this type of claim properly can be brought only under 42 U.S.C. § 1983 and the Prison Litigation Reform Act, not in this habeas proceeding. See Hill v. McDonough, 547 U.S. 573, 583-84, 126 S. Ct. 2096, 165 L. Ed. 2d 44 (2006)(holding an inmate's challenge to the method of execution is cognizable under section 1983). See Hutcherson v. Riley, 468 F.3d 750, 754 (11th Cir. 2006). In Hutcherson, the Eleventh Circuit Court of Appeals stated:

> [t]he line of demarcation between a § 1983 civil rights action and a § 2254 habeas claim is based on the effect of the claim on the inmate's conviction and/or sentence. When an inmate challenges the "circumstances of his confinement" but not the validity of his conviction and/or sentence, then the claim is properly raised in a civil rights action under § 1983. Hill, 126 S. Ct. at 2101. However, when an inmate raises any challenge to the "lawfulness of confinement or [the] particulars affecting its duration," his

claim falls solely within "the province of habeas corpus" under § 2254. Id. at 754. Petitioner is alleging that Florida's three-drug method of lethal injection will cause him unnecessary pain and suffering. This challenge goes strictly to the circumstances of his confinement, not the lawfulness of his confinement or its duration.

Additionally, Petitioner failed to raise this issue in either the direct appeal of his conviction and sentence or in his postconviction proceeding in state court. Therefore, even if his claim were cognizable in this habeas proceeding, it is procedurally barred from federal habeas review. It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[9] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.

---

[9]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

    (A)  the applicant has exhausted the remedies available in the courts of the State; or

    (B) (i)  there is an absence of available State corrective process; or

     (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

Ed. 2d 1 (1999); Picard, 404 U.S. at 277-78.

An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. O'Sullivan, 526 U.S. at 839-40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. Coleman v. Thompson, 501 U.S. 722, 734-35 and n. 1, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); accord Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), rev'd on other grounds, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).

In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. See Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be firmly established and regularly followed, that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308, 1313 (11th

Cir. 2001), or in a manifestly unfair manner. <u>Ford v. Georgia</u>, 498 U.S. 411, 424-25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); <u>Upshaw v. Singletary</u>, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default, the petitioner must show cause for the procedural default and prejudice attributable thereto. <u>See</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 485, 106 S. Ct. 2639, 2644, 91 L. Ed. 2d 397 (1986)); <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (<u>quoting</u> <u>Murray v. Carrier</u>, 477 U.S. at 488). Lack of counsel or ignorance of available procedures is not enough to establish cause. <u>Tower v. Phillips</u>, <u>supra</u>. In order to prove prejudice, a petitioner must show "not merely that the errors at this trial created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>United States v. Frady</u>, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596, 71 L. Ed. 2d 816 (1982)(emphasis in original).

If the petitioner cannot show cause, he may still survive a procedural bar by proving that the failure to hear the merits of the claim would endorse a fundamental miscarriage of justice. <u>Murray</u>, 477 U.S. at 495. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327. Further:

a substantial claim that constitutional error has caused the conviction of an

innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

Id.

Because Petitioner has not exhausted this claim in state court and because he is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review.  See Coleman v. Thompson, supra. Additionally, the Florida Supreme Court has consistently rejected this type of challenge to its protocols regarding the three-drug method of execution.  See Lightbourne v. McCollum, 969 So.2d 326, 349-53 (per curiam)(Fla. 2007), cert. denied, 128 S. Ct. 2485, 171 L. Ed. 2d 777 (2008); Ventura v. State, 2 So.3d 194, 198-201 (Fla. 2009).

Finally, while not pled with specificity, Petitioner attacks the constitutionality of Florida's use of the three-drug protocol method of execution by lethal injection stating that execution by this method "causes prolonged, extreme, pain and suffering to the person being executed."  (Doc. 1 at 33).  This claim has been foreclosed by Baze v. Rees, ___ U.S. ____, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008), in which the Supreme Court upheld a similar three-drug lethal injection protocol as not constituting cruel and unusual punishment under the Eighth Amendment.  Furthermore, revisions to Florida's lethal injection protocols provide additional safeguards.  See Baze, 128 S. Ct. at 1570-71 (Ginsburg, J., dissenting)(noting that Florida has adopted safeguards for protection not found in Kentucky's protocols by taking measures to assess an inmate's consciousness).  Therefore, Petitioner is not entitled to relief on this claim in this proceeding.

## IV. CONCLUSION

For the foregoing reasons, the Petition for Writ of Habeas Corpus (Doc. 1) is DENIED.


ORDERED on September 25, 2009.


/S/ Richard Smoak_____
RICHARD SMOAK
UNITED STATES DISTRICT JUDGE